# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LEATRICE TAYLOR ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 7178 |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| BNSF RAILWAY COMPANY, ) | |
| ) | |
| ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Leatrice Taylor filed suit against BNSF Railway Company, asserting claims of sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII").[1]  Before the court is BNSF's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  For the following reasons, the motion [#59] is granted in part and denied in part.[2]

### BACKGROUND[3]

**I.    Taylor's Employment at BNSF Prior to 2002**

BNSF is one of the largest freight railway companies in the United States.  A small

---

[1] Taylor's amended complaint also asserts a claim for violation of the Equal Pay Act, 29 U.S.C. § 206(d).  She voluntarily dismissed this claim on January 20, 2011.

[2] This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).  Venue is proper under 28 U.S.C. § 1391(b) because the events that gave rise to Taylor's claims occurred in this district.

[3] The facts set forth in this section are derived from the statements of fact and supporting documents submitted by the parties to the extent they comport with Local Rule 56.1.  They are taken in the light most favorable to Taylor, the non-movant.

portion of BNSF's business is devoted to commuter passenger services, including one of the Metra lines in the Chicago area.

Two departments are involved in BNSF's daily operations: the Operating Department and the Intermodal (Marketing) Department. The Operating Department is responsible for the operation, movement, and maintenance of train locomotives and train cars in terminals and on cross-country tracks. Most of BNSF's employees work in the Operating Department. The Intermodal Department is responsible for loading and unloading freight cars in the terminals. The loading and unloading is performed by BNSF's service partners, who are managed by BNSF.

Taylor started working at BNSF in 1993, after receiving her high school diploma from Dunbar Vocational High School and serving in the Navy for approximately eleven months. Between 1993 and 2001, Taylor held several positions in the Operating Department. She started as Conductor and was subsequently promoted to Yardmaster, Locomotive Engineer, and finally to Terminal Trainmaster. The Terminal Trainmaster position is considered to be a first-level "management" position in the Operating Department. As Terminal Trainmaster, Taylor supervised conductors, yardmasters, engineers and locomotive train crews in the train terminal. David Davenport, who was Taylor's supervisor when she worked as Terminal Trainmaster from 1997 to 2001, testified that Taylor was a good Trainmaster and a "dependable, smart, [and] very good employee."

Taylor transferred to the Intermodal Department in May 2001 when she was promoted to Manager of Hub Operations, Grade Level 30, in BNSF's Corwith facility. She still holds this position. As Manager of Hub Operations, Taylor oversees the process of loading and unloading

freight cars in the terminals. She manages the companies that contract with BNSF to load and unload the trains, repair tires, and keep the intermodal train facility running smoothly. Taylor also communicates with BNSF's trainmasters to let them know when trains will be ready and provides detailed reports regarding the type of freight that was on a train. She has experience with planning and development, safety, and customer support. Since 2004, all of Taylor's performance reviews have been overall "On Target," "Achieves," or "Exceeds." John Clement, Taylor's supervisor in the Intermodal Department, testified that Taylor has very strong technical, written and verbal skills and that she works closely with the Operating Department. Clement further testified that working as Hub Manager is an excellent midlevel position because it gives employees the opportunity to acquire leadership, management, and planning skills that will allow them to progress at BNSF.[4]

## II. Taylor's Post-2002 Job Applications

Taylor applied for twenty-four positions between 2002 and April 2007, including vacancies for Manager Hub Operations, seven postings for Terminal Managers, Assistant Locomotive Utilization, Superintendent Coal Operations, four postings for Manager Intermodal and Automotive Operations, Superintendent Corridor Operations, Manager Corridor Operations, and Assistant Manager/Manager Hub Operations. Taylor was not selected for any of these positions. Five were never filled, three were filled by women, and sixteen were filled by men.

In April 2007, Taylor applied for a Terminal Manager position in Memphis. The Terminal Manager is part of the Operating Department and plans, develops, and organizes the

---

[4] Davenport, on the other hand, attests that Taylor's move to the Intermodal Department was a "waste of talent" because she would limit her opportunities for promotions in the company.

operation of locomotive and train cars in the train terminals. Promotion to the Terminal Manager position is not based on seniority or the number of years in a particular position but, rather, is based on an applicant's interview score. BNSF's job posting stated that the Terminal Manager's responsibilities would include supervising Trainmasters and TE&Y employees,[5] planning daily train and switching operations, holding investigations, and recommending discipline. (Taylor Dep. Ex. 15.) The posting stated that "terminal operations experience," supervisory experience, and "working knowledge of operating rules and schedule agreements applicable to the TE&Y crafts" are required. (*Id.*) Ryan Shoener, the Terminal Superintendent for Memphis, and Elaine Stewart, the HR Manager, were responsible for filling the position.

Taylor provided the following description of her duties as a Hub Manager in her application for the Terminal Manager position:

> Monitor Intermodal Customer goals on shipments received or departing Cowith [*sic*] facility. Coordinate with IBU ops to ensure we have enough train [*sic*] symbols to protect our freight and/or consolidate trains when needed. I also have to ensure that our service partners comply with our (BNSF) safety policies and meet our designated standards.

(Taylor Dep. Ex. 17.) She described her prior position of Terminal Trainmaster as follows:

> Organize, coordinate and support terminal activities to achieve efficient, economical operations. Assisting in implementation of new policies and insuring compliance with safety and operating rules[,] equal employment policies, scheduled agreements and government regulations.

(*Id.*) Fifty-nine BNSF employees applied for the position, and Stewart screened the applications to determine whether the applicants met minimum qualifications. Taylor was included in the group of thirty applicants who passed the initial screening. She was not, however, selected for

---

[5] TY&E employees are unionized.

an interview.

The ten applicants who were selected for interviews had recent experience in the Operating Department. Bret Witers was hired for the position. Witers had worked in the Operating Department at BNSF for three years, first as a Terminal Trainmaster and then as a Division Trainmaster for approximately two and one half years. As Division Trainmaster, Witers had been responsible for managing the train operations in an entire territory. Prior to working at BNSF, Witers had served in the Navy for 20 years. In 2002, he had graduated *magna cum laude* from Columbia College of Missouri with a B.A. in Business Administration, and he obtained a MBA from Columbia College in 2004 with a 3.5 GPA.

Schoener and Stewart both testified that Taylor was not selected because she did not have recent "daily train operations" experience. Shoener testified that, as a Hub Manager, Taylor would have "interacted" with the Operating Department but that she would not have been involved in "managing" or "overseeing" the operation of the trains. (Shoener Dep. at 38–39.) Shoener testified that the Intermodal Department "does not directly oversee scheduled employees in the field and also does not completely coordinate the overall train operations that a role of a trainmaster or a terminal manager does or a division trainmaster." (*Id.* at 41.) Shoener further testified that it was very important that a candidate have recent "operations experience" because the new Terminal Manager would have to hire and supervise two new trainmasters. In November 2007 (after Taylor filed her charge of discrimination), Stewart stated in an email that the ten candidates who were interviewed were all rated as "exceeds target" on their performance evaluations and that all ten candidates had experience in "daily train operations, crew management, [and] safety and manpower planning." In fact, two of the selected candidates were

rated only as "on target."

Neither Shoener nor Stewart is aware of any female Terminal Managers in the Springfield division (which includes Tennessee, Alabama, Mississippi, Oklahoma, Missouri, and parts of Illinois) or any female managers over pay grade 30. Schoener does not recall ever interviewing or hiring a woman.

Also in April 2007, Taylor applied for a Terminal Manager position in Willow Springs, Illinois. The job description and requirements were the same as those for the Terminal Manager position in Memphis, and Taylor submitted the same materials. (*See* Taylor Dep. Exs. 25, 19.) Davenport, who had supervised Taylor when she worked as a Terminal Trainmaster from 1997 to 2001, was the Terminal Superintendent in charge of hiring the Terminal Manager. HR Manager Cheryl McClusky assisted Davenport in the hiring process. Davenport selected Taylor for an interview because he had a favorable impression of her work as a Terminal Trainmaster. Taylor, like the other candidates, was interviewed over the phone. Each candidate was asked the same questions from an interview guide provided by the HR department. Davenport and McClusky took notes on the candidates' answers to the questions and gave each candidate a score, on a scale of one to five, on their answers to the interview questions.

During her interview, Taylor was asked about ways that BNSF might improve its TY&E attendance policy. At the time, the policy was less than six months old, and Taylor responded that she was not able to provide any comments because she did not work with the policy on a daily basis. Davenport's notes reflect that he gave Taylor a two out of five on this question and that Taylor stated that she was "not that familiar" with the policy because she was in the Intermodal Department. (Davenport Aff. Ex. 1.) McClusky gave Taylor a one out of five on this

6

question and her notes similarly reflect that Taylor stated that she was "not that familiar" with the policy. (*Id.*) During her interview, Taylor was also asked whether she had any experience with a "formal investigative process." She responded that it had been at least eight years since she had done an investigation. Davenport and McClusky gave Taylor a two out of five on this answer.

Randy McMahan was hired for the Willow Springs Terminal Manager Position. McMahan had two years of college and had been employed with BNSF since February 1997. All of McMahan's experience was in the Operating Department. He had worked as Conductor, Locomotive Engineer, Assistant Trainmaster, Division Trainmaster and Manager of Safety. For the two years prior to applying for the Terminal Manager position, McMahan had worked primarily in a division office as a Manager of Safety. Davenport testified that he was not sure whether McMahon had ever worked in an intermodal terminal prior to being promoted to Terminal Manager. McMahan had received the highest possible score, five out of five, on the question regarding the TY&E policy. Davenport's notes reflect that McMahon stated that it was a "good policy" and that "it is what it is." Taylor's average interview score was 2.77 and McMahon's average score was 3.95. Taylor testified that she later asked Davenport why she had not received the promotion and he told her that she was "a good runner up" for the position and that "it came down to you and Randy. . . [b]ut we picked him because of the attendance guideline policy 'cause he knows about it already."[6] Davenport testified that the TY&E policy is a "very important policy for BNSF's Operating Department."

---

[6] Davenport has submitted an affidavit wherein he avers that he was disappointed in Taylor's interview because "[h]er answers seemed more responsive to situations on the Intermodal side rather than on the Operations side."

7

In August 2007, Taylor applied again for the Terminal Manager position in Willow Springs, Illinois.[7] Davenport testified that he did not select Taylor for an interview because of her poor performance on her prior interview for the same position. Taylor has never hired a female Trainmaster.

Davenport attests that Torrance Lesure, who was interviewed and then hired for the position, did "very well" during the interview process. By that time, the TY&E question had been removed from the list of interview questions.

Lesure had started working at BNSF in 1993, like Taylor, and had attended college for three years. All of Lesure's experience was in the Operating Department. He had held the positions of Brakeman, Locomotive Engineer, Terminal Trainmaster, and Division Trainmaster. In July 2007, Lesure had been accepted into the promotional candidate pool for Grade 32 level positions, which meant that he was "pre-qualified" for a Terminal Manager position. Employees who were accepted in the pool had completed an application and interview process conducted by senior management and HR in Fort Worth, Texas. Taylor's application for the promotional candidate pool had been rejected. All of the applicants who were accepted into the applicant pool were men.

Lesure had also interviewed for the April 2007 Terminal Manager position in Memphis. He received an average rating of 1.95 on his interview, the lowest score out of all the interviewees. Lesure had also applied for the April 2007 Willow Springs Terminal Manager position that was given to McMahan, but Davenport did not select him for an interview.

---

[7] McMahon had been promoted to Assistant Terminal Superintendent, and BNSF was trying to fill his vacancy. Taylor argues that McMahon's promotion violated BNSF's internal policy of not promoting an employee until he or she has been in a position for eighteen months. Whether or not McMahon was promoted too soon is not relevant to the merits of Taylor's claims.

8

Taylor filed her first EEOC charge on October 3, 2007, alleging sex discrimination based on BNSF's failure to promote. Subsequently, Taylor applied for multiple Terminal Manager positions. Davenport was the hiring manager for five of the open Terminal Manager positions that Taylor applied for in 2009 and 2010. Taylor was not selected for an interview for any of these positions. All of the positions were filled with male hires.

In July of 2009, Taylor applied for a Terminal Manager-Suburban Services position in Cicero, Illinois. One of the preferred qualifications for the positions was leadership experience with passenger operations. Clayton Johnson was hired for the position. At the time he was interviewed, he had six months' experience as a Trainmaster and had been working as a manager training coordination out of one of BNSF's offices for the past two to three years. At her deposition, Taylor testified that Johnson was better qualified for the position because he was a "rail buff" and because he had prior experience working in commuter passenger services that she lacked. Taylor testified that she believed that she had not been selected for an interview for the position because of her gender, but conceded that Johnson should have gotten the job. Taylor testified that she had worked for seven or eight months as an engineer on suburban commuter lines, but admitted that she had never worked in a position devoted to commuter lines and that her prior suburban experience would not have been apparent from her resume. Timothy Merriweather, who was the hiring manager for the Terminal Manager-Suburban Services position, testified that all five individuals who were interviewed had prior suburban passenger experience. Johnson received the highest score on his interview.

On December 14, 2009, Taylor filed her second EEOC charge, alleging violations of the Equal Pay Act and retaliation. Taylor does not know if any of the hiring managers knew about

9

her charge. BNSF's HR Department limits the dissemination of information regarding EEOC charges in order to prevent retaliation.

## SUMMARY JUDGMENT STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## DISCUSSION

**I.      Scope of the Claims Under Consideration**

Taylor brings sex discrimination claims based on BNSF's failure to promote her during three time periods: (1) between 2002 and April 2007, (2) between April and August 2007, and (3) after October 3, 2007, when she filed her EEOC discrimination charge. BNSF argues that the

10

claims relating to Taylor's pre-April 2007 job applications are time-barred and that Taylor cannot bring claims based on her post-October 2007 applications because she failed to exhaust her administrative remedies.

Taylor concedes that any sex discrimination claims relating to her pre-April 2007 job applications are time-barred. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII's 300 day statute of limitations).[8] She argues that she should be able to bring sex discrimination claims related to jobs that she applied to after she filed her first EEOC charge, in October 2007, because these claims are "like or reasonably related to" the allegations in the charge. *See Cheek* v. *W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (quoting *Jenkins* v. *Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976)).

A plaintiff may not bring a claim in federal court that was not originally included in the EEOC charge. *Id.* (citing *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974)). To determine whether a claim was adequately brought to the attention of the EEOC, courts consider whether the claim is "like or reasonably related" to the allegations in the plaintiff's EEOC charge and could reasonably be expected to grow out of an investigation of the charge. *Sitar* v. *Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003) (citing *Jenkins*, 538 F.2d at 167). This means that "the EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals." *Cheek*, 31 F.3d at 500. These requirements ensure that the employer is notified of the conduct in the employee's complaint and gives the employer the opportunity to seek conciliation without resort to the courts. *Rush* v.

---

[8] Taylor may, however, refer to discrete discriminatory acts that occurred outside the statutory time period as background evidence in support of her timely sex discrimination claims. *See Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

*McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). "Normally, retaliation, sex discrimination, and sexual harassment charges are not like or reasonably related to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another." *Sitar*, 344 F.3d at 726 (quotations and citation omitted).

The Seventh Circuit has noted that when the plaintiff complains of a failure to promote that occurred after she filed her EEOC charge, there is no way that the EEOC could have undertaken the preliminary investigation contemplated by Title VII. *Conner* v. *Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005) (claim relating to failure to promote that occurred after charge was filed was time-barred); *see also Geldon* v. *S. Milwaukee Sch. Dist.*, 414 F.3d 817, 820 (7th Cir. 2005) (plaintiff could not bring claim for failure to promote related to position that was not named in EEOC charge). The cases cited by Taylor are distinguishable because they involve *retaliation* that occurred after the plaintiff's EEOC charge was filed, rather than, as here, a failure to promote. *See Adler* v. *Evanston Nw. Healthcare Corp.*, No. 07 C 4203, 2008 WL 5272455, at *8 (N.D. Ill. Dec. 16, 2008); *Enriquez* v. *U.S. Celllular Corp.*, No. 06 C 3135, 2008 WL 4925012, at *9 (N.D. Ill. Nov. 14, 2008). Therefore Taylor cannot bring sex discrimination claims arising from BNSF's failure to promote her after October 2007.[9]

---

[9] Taylor does not argue that she exhausted her administrative remedies because her post-2007 claims are like or reasonably related to the claims alleged in her December 2010 EEOC charge. To prevail on this theory, Taylor would need to show that the failures to promote occurred within Title VII's statute of limitations, calculated from December 2010. She would also need to cite specific facts that would lead the court to conclude that her claims for discrimination are "so related and intertwined in time, people, and substance" that they are "like or reasonably related to" the retaliation claim in her December 2010 EEOC charge. *See Sitar*, 344 F.3d at 726–27.

## II. Taylor's Sex Discrimination Claim

Taylor claims that BNSF's failure to promote her to the three Terminal Manager positions in Memphis and Willow Springs constitutes unlawful sex discrimination. To establish sex discrimination under Title VII, Taylor may proceed either directly, by presenting direct and/or circumstantial evidence of discriminatory intent, or indirectly, by utilizing the burden-shifting method established by *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the direct method, Taylor may prove her case through direct evidence (such as an admission by the decisionmaker that his actions were based on unlawful animus) or through circumstantial evidence, which is "evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rogers* v. *City of Chicago*, 320 F.3d 748, 753–54 (7th Cir. 2003); *Alexander* v. *Wisc. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). Under the indirect method, Taylor must first make out a *prima facie* case for discrimination by showing that (1) she is a member of a protected class, (2) she met BNSF's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not in the protected class were treated more favorably. *See Scaife* v. *Cook Cnty.*, 446 F.3d 735, 739 (7th Cir. 2006). Once the Taylor has established a *prima facie* case, there is a presumption of discrimination. "The burden must then shift to [BNSF] to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. Taylor must then rebut BNSF's rationale "by presenting evidence sufficient to enable a trier of fact to find that the . . . proffered explanation is pretextual," which gives rise to the inference of discrimination. *Peele* v. *Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Taylor argues that the evidence is sufficient to support her claim of sex discrimination

13

under either the direct or indirect method of proof.

### A. Whether Taylor Has Demonstrated That There is an Issue of Fact Under the *McDonnell Douglas* Indirect Method of Proof

BNSF first argues that Taylor has not established a *prima facie* case of discrimination because she was not qualified for the April 2007 Memphis Terminal Manager position. Given that Taylor was subsequently selected for an interview for the April 2007 Willow Springs Terminal Manager position, this argument is without merit. BNSF has cited no differences between the Memphis position and the Willow Springs position that would explain why Taylor was qualified for one position but not the other. BNSF does not contest that Taylor was a member of a protected class, that the failure to promote could constitute an adverse employment action, or that the males who were hired for the Terminal Manager positions were similarly situated to Taylor. Accordingly, Taylor has established a *prima facie* case of discrimination.

BNSF has, however, articulated legitimate, non-discriminatory reasons for hiring candidates other than Taylor for the three Terminal Manager positions. BNSF asserts that Taylor was not selected for the April 2007 Terminal Manager position in Memphis because Shoener needed to hire someone with recent experience in the Operating Department who could quickly hire and supervise two Terminal Trainmasters. With respect to the first Terminal Manager position in Willow Springs, BNSF asserts that McMahon was selected instead of Taylor because he performed better during his interview and because he had more recent experience in the Operating Department. Finally, with respect to the second Terminal Manager position in Willow Springs, BNSF asserts that Taylor was not selected because she had performed poorly on her prior interview and because Lesure had more recent Operating

Department experience.[10]

The key issue is whether Taylor has demonstrated that there is an issue of fact as to whether BNSF's stated reasons are actually a pretext for sex discrimination. To establish pretext, Taylor must present evidence "suggesting that [BNSF] is dissembling." *Coleman* v. *Donahoe*, — F.3d —, 2012 WL 32062, at *12 (7th Cir. Jan. 6, 2012) (quoting *O'Leary* v. *Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered" as to why Taylor was not promoted. *Id.* (quoting *O'Leary*, 657 F.3d at 635.) To meet this burden, Taylor "must identify such weaknesses, implausibilities, inconsistencies, or contradictions . . . that a reasonable person could find [it] unworthy of credence." *Id.* (quoting *Boumehdi* v. *Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). Drawing all inferences in Taylor's favor, the court concludes that her burden has been met.

Taylor has demonstrated that there is an issue of fact as to whether experience in "terminal operations," which is what BNSF's job posting required and what the hiring managers referred to when they described the necessary qualifications, is synonymous with experience in the Operating Department, which is what BNSF focuses on in this litigation. Taylor testified that she frequently worked with the employees in the Operating Department and that "terminal operations" is the manner in which the terminal operates and is not specific to a single department. Davenport similarly testified that intermodal operations is a part of train operations

---

[10] BNSF also asserts that Taylor failed to take advantage of potentially advantageous opportunities such as job shadowing and that Taylor did not tell Clement, her supervisor in the Intermodal Department, that she was applying for each promotion, as is the norm. BNSF admits, however, that none of the selected candidates had engaged in job shadowing and does not develop the argument that Taylor's failure to seek a recommendation from Clement somehow made her less qualified than the successful applicants.

and that as of 2007 Taylor would have had fourteen years of experience in "terminal operations." Given that BNSF's job postings referenced "terminal operations," rather than experience in the "Operating Department," a reasonable person could conclude that BNSF does not honestly believe that Taylor was not selected simply because she had not recently worked in the Operating Department. This conclusion is further supported by the fact that Taylor did have significant experience in the Operating Department – indeed she had worked in that department for more years than some of the male candidates who were promoted instead of her.

Taylor's and Davenport's testimony also creates an issue of fact as to whether some of the candidates who were hired for the Terminal Manager positions had more "terminal operations" experience than Taylor. Witers had only worked for BNSF for three years, as compared to Taylor's fourteen years' experience, and had spent the majority of his career in a Division Trainmaster position, which is not a position in the train terminal. McMahon had spent the past two years working out of BNSF's corporate office, as a Manager of Safety. Lesure is the only candidate who was presently working in an intermodal terminal at the time he was promoted to Terminal Manager.

In addition, Stewart's email and Davenport's statements to Taylor suggest that BNSF's stated reasons for not hiring Taylor have changed during the course of litigation. In November 2007, Stewart sent an email stating that the candidates who were selected for interviews for the April 2007 Terminal Manager position in Memphis had experience in "daily train operations." BNSF admits that Taylor had experience in daily train operations because of her work as a Yardmaster, Locomotive Engineer, and Terminal Trainmaster. Then, after Taylor failed to be hired for the April 2007 Terminal Manager position in Willow Springs, Davenport told her that

16

she was "a good runner up" and that she had not gotten the job because she did not demonstrated a good understanding of BNSF's TY&E policy. Both Stewart and Davenport failed to mention that Taylor did not receive the promotions because she did not work in the Operating Department. Moreover, Davenport's statement that Taylor was "a good runner up" contradicts BNSF's assertion that she performed so poorly on her interview that she was not selected again when she re-applied for the position in August 2007. Indeed, the TY&E question was removed from the interview questionnaires by August 2007, calling into question BNSF's assertion that it was an extremely important policy for prospective Terminal Managers to understand.

Finally, BNSF's assertion that Taylor was not selected for the August 2007 Terminal Manager position because of her poor interview is called into question by the fact that Lesure, who was hired for the position, had also done poorly on a prior interview. Nor was Lesure even selected for an interview the first time he applied for the Terminal Manager position in Willow Springs. BNSF asserts that there is no evidence that Davenport knew of Lesure's prior interview score, but this is beside the point. Taylor was penalized for her poor interview performance by being denied subsequent promotional opportunities. Lesure was not. This fact undermines BNSF's assertion that Taylor's low interview score was the reason she was not selected for an interview in August 2007.

BNSF argues that summary judgment must be granted because Taylor has not demonstrated that its subjective decision-making process was intentionally discriminatory. *See Millbrook* v. *IBP, Inc.*, 280 F.3d 1169, 1178 (7th Cir. 2002). While it is true that a plaintiff cannot create an issue of fact simply by offering evidence of her competing qualifications, *id.* at 1180, it is well-established that a plaintiff may establish pretext by showing that the employer

17

has given a different explanation for the adverse employment decision during the course of litigation than it initially gave at the time when the decision was made. *See Emmel* v. *Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634–35 (7th Cir. 1996) (citing *Perfetti* v. *First Nat'l Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991)). Taylor has demonstrated that BNSF's assertion that Taylor was not selected because she lacked recent experience in the Operating Department is inconsistent with statements made to Taylor at the time she was denied the promotions, contemporaneous statements made by BNSF's employees, and testimony of BNSF's management that Taylor's experience could be considered "terminal operations experience," which is the only requirement listed in BNSF's job description. Taylor has also called into question BNSF's assertion that she was not selected for the August 2007 Terminal Manager position because of her prior poor interview score. For all of these reasons, Taylor has demonstrated that there is a genuine issue of fact as to whether BNSF's stated reasons for its adverse employment actions are pretextual. The court need not consider whether Taylor's claims might also succeed under the direct method of proof. BNSF's motion for summary judgment on Taylor's sex discrimination claim will be denied.

## III. Taylor's Retaliation Claim

Taylor also asserts a claim for retaliation based on the promotions that she applied for after filing her October 2007 charge with the EEOC. Taylor has not cited any direct or circumstantial evidence that would support the conclusion that BNSF denied her promotions in retaliation for filing her discrimination charge. Therefore she must proceed using the indirect method of proof, which requires that she first make out a *prima facie* case of retaliation showing: (1) she engaged in statutorily protected activity; (2) she met BNSF's legitimate employment

expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Moser* v. *Ind. Dep't. of Corrs.*, 406 F.3d 895, 904 (7th Cir. 2005). If Taylor makes out a *prima facie* case, the court will consider BNSF's stated reason for the adverse action and whether Taylor has established pretext, using the *McDonell Douglas* burden-shifting framework described above. *See id.*

Taylor has failed to demonstrate that the evidence supports her claim for retaliation. With the exception of one position, she has failed to provide any information about the applicants who were selected, other than to state that they were male. Therefore the court cannot determine whether the employees who were promoted were similarly situated to Taylor. The only post-2007 job application that Taylor discusses in detail is her July 2009 job application for the Terminal Manager - Suburban Services position, which was eventually given to Johnson. Taylor admits, however, that Johnson was more qualified for the position and that he was the best candidate. This dooms her *prima facie* case. Summary judgment will be granted on Taylor's retaliation claim.

**CONCLUSION AND ORDER**

BNSF's motion for summary judgment [#59] is granted in part and denied in part. Judgment is entered in favor of BNSF on Taylor's retaliation claim. This case is set for a status hearing on March 20, 2012 at 8:30 a.m.

Dated: Feb. 27, 2012        Enter:_____
                                               JOAN HUMPHREY LEFKOW
                                               United States District Judge